IN THE UNITED STATES DISTRICT COURT
DISTRICT OF THE DISTRICT OF COLUMBIA

**FILED**

**SEP 2 6 2008**

Clerk, U.S. District and
Bankruptcy Courts

TY CLEVENGER,
1716 BRIAR CREST DRIVE, SUITE 206
BRYAN, TEXAS 77802, PRO SE
Plaintiff,

vs.

SHANETTA CUTLAR; TAMMIE M.
GREGG; JOSEPH J. SPERBER, IV;
JUDY PRESTON; WAN J. KIM; RENA
COMISAC; GRACE C. BECKER;
TOBI EDWARDS; BRIAN JUNG;
and MICHAEL B. MUKASEY,

Defendants,

Case: 1:08-cv-01657
Assigned To : Huvelle, Ellen S.
Assign. Date : 9/26/2008
Description: Employ. Discrim.

**JURY ACTION**

## ORIGINAL PETITION

**NOW COMES** Ty Clevenger ("Plaintiff") and alleges and states the following on information and belief:

### Jurisdiction and Venue

1.  This Court has jurisdiction because the Plaintiff brings claims against current and former officers of the federal government pursuant to *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.*, and the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1964.

2.  Venue is proper because the issues giving rise to this lawsuit occurred in the District of Columbia, and because Defendant Michael B. Mukasey is sued in his capacity as Attorney General of the United States and chief officer of the United States Department of Justice, which agency is headquartered in the District of Columbia.

1

## Parties

3. Plaintiff Ty Clevenger is an attorney residing in Bryan, Texas. He formerly worked as a trial attorney in the Special Litigation Section of the Civil Rights Division, U.S. Department of Justice.

4. Defendant Shanetta Y. Cutlar is the Section Chief of the Special Litigation Section.

5. Defendant Tammie M. Gregg is the Principal Deputy Section Chief of the Special Litigation Section. Defendant Cutlar appointed her Principal Deputy over more qualified personnel, as she was a personal friend of Defendant Cutlar and attended the same church as Defendant Cutlar.

6. Defendant Joseph J. Sperber, IV is a trial attorney in the Employment Section of the Civil Rights Division, U.S. Department of Justice. He formerly worked as a deputy section chief in the Special Litigation Section.

7. Defendant Wan J. Kim is a former Assistant Attorney General for Civil Rights.

8. Defendant Rena Comisac is a former Principal Deputy Assistant Attorney General for Civil Rights.

9. Defendant Grace C. Becker is the Acting Assistant Attorney General for Civil Rights.

10. Defendant Tobi Edwards formerly worked as counsel to Defendant Kim and was ombudsperson of the Civil Rights Division.

11. Defendant Brian Jung is an investigator in the Special Litigation Section.

12. Defendant Michael B. Mukasey is the Attorney General of the United States and is sued solely in his official capacity.

## Facts

13. In April of 2005, the Plaintiff was offered a position as a trial attorney in the Special Litigation Section (the "Section") after an interview with Defendant Cutlar and Bradley Schlozman,

Deputy Assistant Attorney General for Civil Rights. The Plaintiff later learned that Defendant Cutlar and Mr. Schlozman had a love-hate relationship in which Mr. Schlozman granted Defendant Cutlar more latitude to run the Special Litigation Section in exchange for Defendant Cutlar carrying out his political orders. The Plaintiff surmises that Mr. Schlozman directed Defendant Cutlar to hire the Plaintiff, something that Defendant Cutlar resented.

14. A short time after the job offer, the Plaintiff called Defendant Cutlar and informed her that he wished to decline the offer because he thought the job might exacerbate his struggles with depression. Specifically, the Plaintiff told Defendant Cutlar that he had been voluntarily hospitalized for depression the previous year, and he was wary of a job that would require on-site investigations of mental health facilities, jails, prisons, and juvenile detention centers. Defendant Cutlar urged the Plaintiff to reconsider, stating that the Section would be supportive and would benefit from his perspective. After further consideration, the Plaintiff accepted the job offer and began work at the Department of Justice on August 22, 2005.

15. Immediately after his arrival in the Section, the Plaintiff noticed that most attorneys and support staff hid in their offices, usually with the doors closed. After a few days, the Plaintiff's colleagues explained that Defendant Cutlar was mentally unstable and habitually abusive toward employees. In one instance reported by colleagues, Defendant Cutlar berated an intern until she was in tears because the intern did not say "hello" to Defendant Cutlar in a hallway. During the Plaintiff's tenure, Defendant Cutlar berated another intern, Deborah Meiners, because Ms. Meiners did not give Defendant Cutlar the greeting that she thought a section chief deserved (Ms. Meiners had not met Defendant Cutlar before and did not notice her in the hallway). Similarly, Defendant Cutlar publicly berated a new attorney, Anita Snyder, because Ms. Snyder used a paperclip on a document instead of a binder clip.

16. On October 10, 2005, the Plaintiff e-mailed Defendant Cutlar to request a meeting. The Plaintiff met with Defendant Cutlar and told her that he was experiencing a recurrence of depression problems. Defendant Cutlar's behavior was somewhat bizarre, as she told the Plaintiff not to be offended if she laughed, because she had a problem with nervous laughter. Defendant Cutlar told the Plaintiff that she expected him to maintain his workload, and the Plaintiff agreed that he would do so to the best of his ability. In the weeks that followed, the Plaintiff worked considerably more than 40 hours per week in an effort to compensate for difficulty concentrating.

17. About three weeks after meeting with Defendant Cutlar, the Plaintiff was called into Defendant Cutlar's office for his first ream-out session. Defendant Cutlar berated the Plaintiff because, she said, he did not know enough details about a particular case on which he was working.

18. On or about the first week of December 2005, the Plaintiff experienced his first full "docket review," *i.e.*, a quarterly performance review, with Defendant Cutlar. In front of all her deputies, Defendant Cutlar ridiculed the Plaintiff for having logged so many hours, claiming that his productivity did not match the number of hours worked. The Plaintiff explained that he had worked the additional hours to compensate for the fact that he was depressed and was having difficulty concentrating.

19. On January 4, 2006, the Plaintiff e-mailed Defendant Kim regarding "difficulties with the work environment in Special Litigation, some of which are personal/medical, and some of which affect all attorneys in the section." The Plaintiff requested a meeting with Defendant Kim because, when Defendant Kim administered the oath of office to the Plaintiff and two other attorneys, Defendant Kim said he wanted to be notified if the new attorneys had any problems or concerns about the Civil Rights Division.

20. Defendant Kim did not respond to the e-mail, but instead forwarded it to Defendant

Edwards. Shortly thereafter, Defendant Edwards contacted the Plaintiff and arranged a meeting. At the meeting, the Plaintiff described numerous instances in which Defendant Cutlar had abused and sabotaged employees in Special Litigation. The Plaintiff identified other witnesses who could attest to the miserable working conditions under Defendant Cutlar, as well as specific instances of misconduct involving Defendant Cutlar. Defendant Edwards said she was not surprised to hear such reports about Defendant Cutlar, because Defendant Edwards had worked as a trial attorney in the Employment Section and, she said, Defendant Cutlar's bad reputation was widely known. The Plaintiff informed Defendant Edwards that his depression was being exacerbated by Defendant Cutlar's abusive and unpredictable behavior, and he asked if he could be transferred away from the Special Litigation Section. Defendant Edwards said she would look into the matter, and she suggested he contact the disability rights coordinator for the Civil Rights Division.

21.   Defendant Edwards further suggested that the Plaintiff encourage other Special Litigation employees talk to her regarding the conditions in the section. The Plaintiff subsequently encouraged several attorneys to talk with Defendant Edwards regarding Defendant Cutlar, but most said they were afraid of retaliation. Nonetheless, two attorneys arranged meetings with Defendant Edwards and corroborated the Plaintiff's statements about Defendant Cutlar.

22.   In the months that followed, Defendant Edwards assured the Plaintiff that she was working to find a solution to the problems in Special Litigation. No solutions ever came forth, however, and over time Defendant Edwards began to ignore reports from attorneys and staff in the Special Litigation Section about Defendant Cutlar. Meanwhile, Defendant Cutlar escalated her pattern of malicious fault-finding toward the Plaintiff, aided by her chief crony, Defendant Gregg.

23.   On January 11, 2006, the Plaintiff e-mailed Angela Gantt, disability rights coordinator for the Civil Rights Division, to inquire about an accommodation request. Thereafter, the Plaintiff

and Ms. Gantt discussed various options, including a transfer to another section or a flexible work schedule. The Plaintiff informed Ms. Gantt that he was reluctant to complete an accommodation request for a transfer, because he suspected that Defendant Cutlar would retaliate if she knew he was requesting a transfer because of her misconduct. Meanwhile, the Plaintiff began searching for employment outside the Department of Justice.

24. On January 23, 2006, the Plaintiff informed Ms. Gantt that Ms. Cutlar was exacerbating his depression problems, and he requested a transfer "[i]f at all possible." On January 27, 2006, one day after being yelled at and cursed at by Defendant Cutlar in a hallway regarding a perceived slight, the Plaintiff e-mailed Ms. Gantt to inquire about the status of his request for assistance.

25. On February 15, 2006, the Plaintiff e-mailed Defendant Edwards, with a copy to Defendant Kim, to report evidence that Special Litigation managers were violating procurement regulations. During an investigation in Pennsylvania, Defendant Brian Jung and the Plaintiff overheard a conversation between Defendant Gregg and a private consultant. The Plaintiff overheard only part of the conversation, but Defendant Jung told the Plaintiff that Defendant Gregg had advised the consultant, a friend of Defendant Cutlar's, about how he could bill the government for travel days, a practice contrary to Justice Department regulations. Subsequently, the consultant submitted a bill that included payment for his travel days, and the Plaintiff refused to approve the bill. Defendant Jung also told the Plaintiff about what he claimed were procurement violations approved by Defendant Cutlar, and the Plaintiff relayed this information to Defendant Edwards.

26. In a February 27, 2006 e-mail, Defendant Cutlar falsely accused the Plaintiff of arriving late to work "far more times than on time." In fact, the Plaintiff had requested a later start time and Defendant Cutlar approved the request. When this was brought to Defendant Cutlar's

attention, she did not apologize but instead criticized the Plaintiff for something else. Two other attorneys told the Plaintiff that they had arrived late numerous times during the same period, but Defendant Cutlar had never mentioned it to them.

27. On or about March 8, 2006, the Plaintiff called Defendant Edwards to inform her that he had an offer from a law firm and to inquire about the status of his request for a transfer. Defendant Edwards responded that she would investigate whether there were openings in other sections, and she asked the Plaintiff about his decision timeline. The Plaintiff informed her that the firm wanted a decision sooner rather than later. Defendant Edwards did not reply. Ultimately, the Plaintiff did not pursue the job offer since it would require a transfer to another city.

28. On March 16, 2006, the Plaintiff informed Ms. Gantt by e-mail that a flexible work schedule would not be an adequate accommodation. The Plaintiff wrote to Ms. Gantt that his problems were being caused by a toxic work environment, and that both his counselor (a licensed clinical social worker) and his psychiatrist agreed that he needed to get out of the Special Litigation Section. The Plaintiff informed Ms. Gantt that his counselor would be writing a letter to that effect. On April 5, 2006, the Plaintiff forwarded to Ms. Gantt a letter, written by his counselor on behalf of the counselor and the Plaintiff's psychiatrist, explaining that the Plaintiff was suffering from depression that was being exacerbated by his working conditions. The letter recommended that the Plaintiff be transferred outside of the Special Litigation Section.

29. In the latter part of March 2006, the Plaintiff contracted severe mastoiditis, lost part of his hearing, and nearly had to have skull surgery. The Plaintiff missed about ten days of work, but he notified the secretarial staff, as he was required to do, of the reason for his absence. Not once during this period did Defendant Cutlar, Defendant Gregg, Defendant Preston, Defendant Sperber or any other supervisor in the Special Litigation Section contact the Plaintiff or express any concern about

his welfare. Nor did they express any concern whatsoever upon his return to work. Instead, Defendant Gregg faulted the Plaintiff for allegedly not carrying his share of the workload in a case in Detroit.

30. In early July 2006, the Plaintiff filed a complaint with the Equal Employment Opportunity ("EEO") staff of the Department of Justice. The Plaintiff alleged that the Department had failed to make a reasonable accommodation for his disability. More than two years later, the complaint is still pending.

31. On July 21, 2006, Defendant Cutlar derided the Plaintiff at his quarterly docket review and told him that his work was unacceptable, but she offered no specifics. Defendant Cutlar told him her conclusions would be reflected in his annual performance review. All the attorneys in the Special Litigation Section received their written performance reviews in August 2006 – except the Plaintiff. The Plaintiff had advised Defendant Cutlar that he intended to appeal her written evaluation, so Defendant Cutlar apparently decided to withhold it until after she could fire him. As it happens, Defendant Cutlar had been reversed before by upper management, specifically because she had made false allegations against an attorney whom she personally disliked.

32. The Plaintiff received a copy of his written evaluation in November of 2007 – fifteen months after the evaluation was completed and more than a year after he was forced to resign. As expected, the evaluation was completely dishonest. Of five rating categories, Defendant Cutlar rated the Plaintiff's performance "unsatisfactory" in three and "minimally satisfactory" in another. The three "unsatisfactory" ratings are particularly instructive. One category is entitled "Presents Oral Arguments, Conducts Trials, Makes Other Court Appearances, and Participates in Moot Courts." Defendant Cutlar rated the Plaintiff's performance "unsatisfactory" but failed to mention that none of his cases were in active litigation, therefore there were no opportunities to present oral arguments or

conduct trials. Defendant Cutlar also rated the Plaintiff's performance "unsatisfactory" in the category of "Conducts Negotiations," but she failed to mention that the Plaintiff was never allowed to negotiate, perhaps because none of his cases were in the negotiations stage. Defendant Cutlar likewise rated the Plaintiff "unsatisfactory" for "Productivity and Professionalism," a subjective category in which she typically punishes people she personally dislikes.

33. On July 31, 2006, Defendant Gregg sent the Plaintiff a long e-mail full of accusations, most of them based on false information from incidents that had occurred weeks before. In an August 8, 2006 e-mail, the Plaintiff finally returned fire on Defendants Cutlar and Gregg, detailing their attempts to "paper" his file and misrepresent his performance. The Plaintiff sent copies of his e-mail to Ms. Gantt, Ms. Edwards, and two human resources officers.

34. On or about September 8, 2006, Ms. Gantt informed the Plaintiff that his request for accommodation (*i.e.*, his request for a transfer) had been denied by Defendants Comisac and Becker because he had not explored other avenues of accommodation, namely, a flexible work schedule. The Plaintiff immediately reported this information to Marcus Coates of the Department's EEO staff.

35. On October 4, 2006, the Plaintiff e-mailed a letter to Deputy Attorney General Paul J. McNulty and Acting Associate Attorney General William W. Mercer outlining Defendant Cutlar's misconduct.

36. Between the evening of October 4, 2006 and October 5, 2006, someone searched the Plaintiff's offices at the Department of Justice. On the afternoon of October 5, 2006, Defendant Cutlar called the Plaintiff into her office and offered him the choice of resigning or being terminated. The Plaintiff resigned.

37. On January 10, 2007, the legal website Abovethelaw.com published the Plaintiff's letter to Mr. McNulty and Mr. Mercer. Over the following weeks, Abovethelaw.com (and other

media outlets) ran numerous articles that portrayed Defendant Cutlar as vicious, unreasonable, and mentally unstable. These articles portrayed the Civil Rights Division in a negative light, and the Plaintiff alleges that Defendants Comisac, Becker, Edwards, Cutlar and Gregg subsequently conspired to discredit the Plaintiff by making false allegations against him.

38. The EEO office assigned the Plaintiff's case to Adept Services, Inc. for investigation, and Adept Services assigned the case to investigator Robert Stamer.

39. Mr. Stamer interviewed the Plaintiff on March 13, 2007 and subsequently interviewed several other witnesses suggested by the Plaintiff. The Department's witnesses, namely Defendants Cutlar, Gregg, Becker, Comisac, Edwards, Sperber, and Preston, apparently refused to be interviewed, and Mr. Stamer was required to submit written interrogatories. The Plaintiff is informed and believes that the Defendants demanded written interrogatories so they would have an opportunity to coordinate their false answers. These Defendants did, in fact, submit false answers in an attempt to portray the Plaintiff in a false light.

40. Mr. Stamer interviewed witness Anita Snyder, who corroborated the Plaintiff's story and provided prima facie evidence of discriminatory treatment. Ms. Snyder confirmed that Defendant Cutlar was abusive toward employees, and Ms. Snyder identified an attorney who was permitted to transfer out of Special Litigation because of a personality conflict with Ms. Cutlar, even though that attorney cited no disability-related reason for the transfer.

41. Mr. Stamer made some initial attempts to contact witness Earnest Reese, who was head secretary for Special Litigation at the time, but he gave up after Mr. Reese did not return his phone calls. Defendant Gregg had sabotaged the Plaintiff by ordering the section's secretaries not to assist the Plaintiff with a typing project, and Mr. Reese was a witness to this event. Mr. Reese was personally aware of Defendant Cutlar's attempts to sabotage employees whom she did not like. Mr.

Reese transferred out of Special Litigation to the Appellate Section, and the Plaintiff is informed and believes that Mr. Reese did not talk to Mr. Stamer because he did not want Defendant Cutlar to block his transfer (and the Plaintiff does not fault Mr. Reese for this in the least).

42. In his communications with Mr. Stamer, the Plaintiff identified other of Defendant Cutlar's former secretaries who had witnessed Defendant Cutlar's abuse of employees and her attempts to sabotage them. The Plaintiff relayed to Mr. Stamer a statement from one of Defendant Cutlar's former secretaries that Defendant Cutlar regularly directed her deputies to sabotage employees lest they face Defendant Cutlar's wrath themselves. The Plaintiff further identified attorneys, secretaries, and paralegals who were themselves sabotaged and abused by Defendant Cutlar, including at least two support staff who said Defendant Cutlar's abusiveness made them physically ill, and one attorney who successfully challenged one of Defendant Cutlar's falsified performance reviews. Finally, the Plaintiff identified one of Defendant Cutlar's former deputy chiefs who warned an attorney (whom the Plaintiff also identified) that once Defendant Cutlar turned against him, no one in management would try to defend him.

43. In interrogatory responses dated July 3, 2007, Defendant Sperber extensively misrepresented the Plaintiff's work performance. In response to a question about whether an accommodation was a "viable option" for the Plaintiff, Defendant Sperber wrote that "it was not feasible to allow [the Plaintiff] to come and go from work whenever he wanted; supervisors need to be able to supervise their staff, and investigations and/or tours are done in the field, require travel and must be scheduled in advance – things that would be very difficult if not impossible to manage if a supervisor does not know when or if an attorney will be at work." Defendants Cutlar, Gregg, and Preston made similar statements. The Plaintiff, however, never asked "to come and go from work whenever he wanted." Moreover, another trial attorney in Special Litigation, Patricia O'Beirne, was

granted the freedom to come and go from work whenever she wanted based on her disability. Ms. O'Beirne regularly showed up late for work, frequently cancelled meetings (and sometimes trips) with little or no notice, and often was allowed to work all day from home. Ms. O'Beirne herself acknowledged to the Plaintiff that she was favored by Defendant Cutlar for reasons unknown to her, and she further acknowledged that Defendant Cutlar left her (*i.e.*, Ms. O'Beirne) alone while targeting other employees for harsher treatment.

44. Defendant Cutlar's favoritism toward Defendant Sperber is further evidence of the Plaintiff's disparate treatment. Defendant Sperber is an alcoholic, and on at least one morning he arrived drunk at a management meeting attended by Defendants Cutlar and Gregg. Defendant Sperber also harassed and belittled Ms. Snyder so severely that Defendant Cutlar and Defendant Gregg apologized for his misconduct. Defendant Sperber, however, was the best man in the wedding of a political employee in the Civil Rights Division, and no action was taken against him despite repeated instances of misconduct. On the contrary, former Acting Assistant Attorney General Bradley Schlozman ordered the Special Litigation Section to give Defendant Sperber a performance award.

45. Susana Lorenzo-Giguere, a supervisor in the Voting Section, likewise has been the beneficiary of the Civil Rights Division's penchant for favoritism. Nearly a year ago, it was publicly reported that Ms. Lorenzo-Giguere requested and received travel reimbursement from the Department while she and her family stayed in their summer vacation home near Boston. Ms. Lorenzo-Giguere still works as a supervisor in the Voting Section.

46. As mentioned previously, a Special Litigation attorney was permitted to transfer to another section because of a personality conflict with Defendant Cutlar. That attorney was accused of saying he was going to go "Color Purple" on Defendant Cutlar, and Defendant Cutlar alleged the

statement was racist. The attorney admitted making the statement (and Mr. Schlozman later advised him he should have lied about it). In any event, Mr. Schlozman transferred the attorney to the Employment Section even though it was not "Open Season," *i.e.*, the annual period when staff can transfer within the Civil Rights Division.

47. Defendants Cutlar, Gregg, Preston, and Sperber all misrepresented the Plaintiff's work performance in their interrogatory responses and portrayed the Plaintiff in a false light.

48. Defendants Cutlar and Gregg falsely accused the Plaintiff of lying to them, and Defendant Jung falsely wrote that the Plaintiff admitted that he lied to his supervisors. Defendant Jung has a reputation for sabotaging other employees, particularly as a means of currying favor with managers. In retrospect, it is now clear that Defendant Jung told the Plaintiff about the alleged procurement violations of Defendant Cutlar (described in Paragraph 25) as a means of instigating controversy. Throughout his July 9, 2007 declaration, Defendant Jung falsely alleges that the Plaintiff was "scheming" and "trying to dig up dirt" on Special Litigation managers. In reality, Defendant Jung reported each and every incidence of alleged misconduct to the Plaintiff, and he *encouraged* the Plaintiff to report these incidences to higher management. Unfortunately, the Plaintiff took the bait. In any event, Defendant Jung never alleged the Plaintiff lied until he was approached by Mr. Stamer more than a year after the incident allegedly took place.

49. In her interrogatory responses, Defendant Edwards deliberately misrepresented the nature of her conversations with the Plaintiff and two other attorneys. For example, Defendant Edwards stated that the Plaintiff had *not* told her about his depression problems at their first meeting in January of 2006, when in fact the Plaintiff told her then that his depression problems were a primary reason for requesting the meeting. Defendant Edwards further tried to portray the Plaintiff's (and the other two attorneys') complaints about Defendant Cutlar as mere dissatisfaction with her

management style. In reality, the Plaintiff (and the other two attorneys) informed Defendant Edwards that Defendant Cutlar tried to sabotage employees whom she did not like.

### Claims

#### Count One: *Bivens* Action

50.   Paragraphs 1-49 are incorporated herein by reference.

51.   Defendants Cutlar, Gregg, Sperber, Preston, Kim, Comisac, and Becker denied the Plaintiff the equal protection of the laws by applying standards to him that were substantially different from those applied to other employees. Defendants Edwards and Jung conspired to assist and did assist the other defendants in this endeavor.

52.   Defendants Cutlar, Gregg, Sperber, Preston, Kim, Comisac, and Becker retaliated against the Plaintiff for exercising his First Amendment rights. Defendants Edwards and Jung conspired to assist and did assist the other defendants in this endeavor.

53.   Defendants Cutlar, Gregg, Kim, Comisac, and Becker failed to supervise employees under their direction and permitted those employees to violate the civil rights of the Plaintiff.

#### Count Two: Rehabilitation Act

53.   Paragraphs 1-52 are incorporated herein by reference.

54.   Defendants Cutlar, Gregg, Kim, Comisac, Becker, and Mukasey failed to provide the Plaintiff with a reasonable accommodation for his disability, thereby violating the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.*

#### Count Three: Racketeering

55.   Paragraphs 1-54 are incorporated herein by reference.

56.   Defendants Cutlar, Gregg, Sperber, Preston, Comisac, Becker, Edwards, and Jung used the mails and interstate wires to defraud the Plaintiff of his job and his opportunity for

reinstatement, thereby violating the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962.

### Count Four: Invasion of Privacy

57.     Paragraphs 1-56 are incorporated herein by reference.

58.     Defendants Cutlar, Gregg, Sperber, Preston, Comisac, Becker, Edwards, and Jung invaded the privacy of the Plaintiff by portraying him in a false light.

### Count Five: Libel

59.     Paragraphs 1-58 are incorporated herein by reference.

60.     Defendants Cutlar, Gregg, and Jung libeled the Plaintiff.

### Count Six: Civil Conspiracy

61.     Paragraphs 1-60 are incorporated herein by reference.

62.     Defendants Cutlar, Gregg, Sperber, Preston, Comisac, Becker, Edwards, and Jung unlawfully conspired to violate the rights of the Plaintiff.

### **Prayer for Relief**

Wherefore, the Plaintiff requests that this Court:

    a.     Award compensatory damages to the Plaintiff against the Defendants, jointly and severally;

    b.     Award punitive damages to the Plaintiff against the Defendants;

    c.     Award treble damages to the Plaintiff against the Defendants;

    c.     Award costs of this action to the Plaintiff;

    d.     Award reasonable attorney's fees and costs to the Plaintiff;

    e.     Order reinstatement of the Plaintiff; and

    e.     Award such other and further relief to which the Plaintiff may be entitled.

Respectfully submitted,

_____
Ty Clevenger, Plaintiff Pro Se
1716 Briarcrest Drive, Suite 206
Bryan, Texas 77802
(979) 260-7030
(979) 530-9523 (fax)
*tyclevenger@yahoo.com*

JURY TRIAL DEMANDED